FILED

03/25/2024

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
October 3, 2023 Session

## STATE OF TENNESSEE v. ANTONIO DEMETRIUS ADKISSON A/K/A ANTONIO DEMETRIUS TURNER, JR.

**Appeal from the Circuit Court for Gibson County**
**No. 19840    Clayburn Peeples, Judge**

_____

### No. W2022-01009-CCA-R3-CD

_____


A Gibson County jury convicted the defendant, Antonio Demetrius Adkisson a/k/a Antonio Demetrius Turner, Jr., of two counts of second-degree murder, for which he received an effective sentence of twenty years in confinement. On appeal, the defendant contends (1) that the juvenile court erred in transferring the defendant to circuit court and (2) that the trial court erred in failing to suppress the defendant's statement. After reviewing the record and considering the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., J., joined. CAMILLE R. MCMULLEN, P.J., dissenting.

Claiborne H. Ferguson, Memphis, Tennessee, for the appellant, Antonio Demetrius Adkisson.

Jonathan Skrmetti, Attorney General and Reporter; Katharine K. Decker, Senior Assistant Attorney General; Frederick Hardy Agee, District Attorney General; and Jason Scott and Scott Kirk, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

*Facts and Procedural History*

This case arises from the murders of the victims, Dearrious Young and Troy Whitmore, on September 26, 2017.[1] The defendant was seventeen years old at the time of the murders, and the State sought to transfer the case against him to circuit court.

I.    *Juvenile Court Motion to Suppress*

Prior to the defendant's arrest, he spoke to Milan Police Department ("MPD") investigators regarding his involvement in the murders. The defendant subsequently filed a motion to suppress his statement, and the juvenile court conducted a suppression hearing on October 13, 2017, during which the State presented the following evidence.[2]

Investigator Jason Williams testified that he went to the defendant's house to speak with him, and when he arrived, Investigator Williams discovered that Officer Allen Alexander and Officer Joe Fountain were already there. The defendant was sitting on the front steps, and his mother was standing beside him. Officer Fountain read the defendant his *Miranda* rights, and the defendant indicated that he understood them.[3] Investigator Williams advised the defendant that he had information regarding the defendant's involvement in the shootings, and because the defendant was quiet and non-responsive, Investigator Williams asked him if he wanted to come to the station and talk. According to the body camera footage, the defendant and his mother were told three times that he was not under arrest and that Investigator Williams simply wanted to have a conversation with the defendant concerning what the defendant knew about a double homicide. The defendant agreed and was driven to the station. The defendant's mother followed a short time later. Once at the station, the defendant was placed in an interview room, and Officer Glenn, the school resource officer at Milan High School, spoke with the defendant for several minutes. However, Investigator Williams did not think the defendant was being honest with Officer Glenn, and he decided to take over the interview. When he entered the interview room, Investigator Williams again advised the defendant of his *Miranda* rights. The defendant did not appear to be under the influence of any drugs or alcohol at the time of the interview, and Investigator Williams was not aware of any mental disease or defect that the defendant was suffering from at that time. Regarding the defendant's educational background, Investigator Williams testified that the defendant was a senior at Milan High School. Investigator Williams described the defendant as "pretty intelligent" based on the fact that they discussed college during the interview and also because the defendant talked about Spanish class with another investigator. Investigator Williams stated that the defendant showed emotion each time he changed his story and became more emotional when he realized how much trouble he was going to be in. Investigator Williams denied

---

[1] The record in this case is voluminous; thus, we will limit our recitation of the facts to that relevant to the issues on appeal.

[2] The motion to suppress filed in juvenile court is not included in the record on appeal.

[3] *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

that the defendant asked to have his mother present in the interview room but agreed that the defendant "asked to see her a few times throughout the night." He also stated that the defendant was allowed to take breaks and was given McDonald's and water.

On cross-examination, Investigator Williams testified that his dispatcher received multiple calls on the night of the shootings, both to the dispatcher's personal cell phone and to the police department, stating that the defendant and Justice Walton were the perpetrators. Although he agreed they were anonymous tips that were unable to be verified, Investigator Williams testified that people in the crowd at the crime scene also told officers to look into the defendant and Mr. Walton. Additionally, hours after the shooting, someone shot at Mr. Walton's grandparents' house, and the defendant's mother told officers that she also expected retaliation on the night of the shootings. Investigator Williams stated that during the defendant's interview he was not handcuffed and was free to leave up until the moment he provided information about his involvement in the shootings. Investigator Williams agreed that he told the defendant that he was facing the death penalty. However, he later learned that because the defendant is a minor he is ineligible for the death penalty, and although his police chief came into the interview room and corrected Investigator Williams' mistake, it was after the defendant admitted to being present at the time of the shootings.

After its review, the juvenile court suppressed the defendant's statement.

## I.     Transfer Hearing

At the transfer hearing, Quavion Lipscomb testified that he is the defendant's cousin and was a senior at Milan High School with the defendant and Mr. Walton at the time of the shootings. He was also friends with the victims as well as a cousins with Mr. Whitmore. On the night of the shootings, the defendant and Mr. Walton came to Mr. Lipscomb's house between 6:00 and 6:30 p.m. and asked the defendant if he wanted to smoke marijuana with them at The Meadows, a nearby apartment complex. Mr. Lipscomb declined but agreed to drop them off at the apartment complex. On cross-examination, Mr. Lipscomb testified that he saw Mr. Walton with a silver gun when Mr. Walton got into his car. He stated that it was in the front of Mr. Walton's shorts "like deep down inside." He agreed that he never saw the defendant with a gun.

J.D.[4], a seventeen-year-old senior at Milan High School, testified that he is a cousin of both the defendant and Mr. Walton and was living in The Meadows apartment complex at the time of the shooting. That night he arrived home from work at 8:00 p.m. and saw

---

[4] It is the policy of this Court to refer to minors by their initials. No disrespect intended.

his friends, Jacarie[5], D.J. Stewart[6], and Mr. Young, talking near some trash cans. J.D. joined them, and at some point, the defendant and Mr. Walton walked past them. Mr. Walton said something to their group, but J.D. did not hear him and replied, "What?" Mr. Walton then "raised up his shirt," and J.D. saw "something silver." Although J.D. agreed that he thought Mr. Walton had a gun, he did not do anything because the defendant and Mr. Walton were walking toward the exit. Instead, J.D., Mr. Stewart, and Jacarie went to J.D.'s apartment and played video games. Around 9:00 p.m. Mr. Young and Mr. Whitmore arrived at J.D.'s apartment and watched them play video games for a few minutes. When Mr. Young and Mr. Whitmore were ready to leave, J.D. testified that he walked them to the front door, and as he walked to his bedroom, he heard gunshots. He and his friends ran outside and saw Mr. Young and Mr. Whitmore on the ground, and J.D. ran upstairs to retrieve his cell phone to call the police. On cross-examination, J.D. denied that there was any bad blood between the defendant and J.D.'s friends. He agreed that he did not tell the officers at the crime scene that the victims had been in his apartment or that he had seen Mr. Walton with a gun.

Officer Dexter Huddleston testified that he was off-duty on the night of the shootings. He lived in the Marshall Gardens apartment complex which was next to The Meadows, and at approximately 9:10 p.m., he was getting into his car to pick up a pizza when he heard a gunshot. Officer Huddleston immediately ran to his apartment to retrieve his firearm and drove his patrol car toward the gunshot. When he arrived in The Meadows, he saw two people standing over two bodies. After exiting his patrol car, Officer Huddleston approached the victims and observed that one of them was still breathing. However, the victim was unable to respond when Officer Huddleston spoke to him. While Officer Huddleston was waiting for additional officers and medical personnel to arrive, additional onlookers approached the scene. However, Officer Huddleston concentrated on comforting the victim who was still alive. On cross-examination, Officer Huddleston testified that he heard four gunshots. However, he stated there may have been more when he was in his apartment retrieving his firearm. He testified that he remained at the scene while it was being processed and did not see any weapons recovered from the victims.

Michael Williams testified that he was preparing to go to his godbrother's house near College Street on the night of the shootings. He was listening to a police scanner app on his phone and heard that someone had been shot in the area. When he arrived at his godbrother's house, he observed two young males "speed walking" through "the cut," which Mr. Williams described as a pathway that the community used to go from one street to another. Mr. Williams asked the people if someone had been shot, and they responded

---

[5] Jacarie's last name does not appear in the record. He is also referred to as Jakari throughout the record.

[6] Mr. Stewart is also referred to as Desmond Stewart in the record.

that they did not know. One of the people used their cell phone, but Mr. Williams was unable to hear their conversation, and Mr. Williams left the house soon afterward. Mr. Williams agreed that he gave a statement to police in which he stated that he saw two individuals running down the pathway and that he described them as spooked, scared, and sweaty. He also told police that the individuals told him they were running because they heard gunshots, that they knocked on the door of a nearby house but no one answered, and that he overheard one of the individuals calling someone for a ride. Mr. Williams testified that officers showed him a photo array and asked him if he recognized the two people that he saw in his godbrother's backyard. Although he agreed that he picked out the defendant's and Mr. Walton's photos and signed them, he testified that he only "thought [he] saw" them. He denied that anyone threatened him for testifying against the defendant.

Investigator David Burton testified that he assisted with securing the scene following the shootings. Afterward, he moved throughout the crowd, listening and asking questions about what people had seen and heard. Later in the investigation, Investigator Burton assisted in obtaining statements from J.D. and Mr. Williams. Based on information the MPD had received regarding the defendant's and Mr. Walton's involvement in the shootings, Investigator Burton compiled a photo array using photographs from the Milan High School yearbook. He showed the array to Mr. Williams, who went through each photo one by one before settling on the photographs of the defendant and Mr. Walton. Investigator Burton testified that Mr. Williams was positive about the identifications when he signed, initialed, and dated the array. Mr. Williams told Investigator Burton that he knew one of the individuals and that he recognized the other one from the street, but he did not indicate which individual he knew. Investigator Burton also testified that Mr. Williams indicated he had concerns for his safety over testifying.

Investigator Jason Williams testified that he responded to the scene as Mr. Whitmore was being loaded into an ambulance. Investigator Williams observed Mr. Young on the sidewalk with four bullet wounds, including one to his right temple. Investigator Williams searched the area and located three shell casings; however, he was unable to locate any weapons. While at the crime scene, Investigator Williams was informed that Mr. Whitmore had died at the hospital, and after processing the scene, he went to the hospital to photograph and document Mr. Whitmore's wounds. His preliminary evaluation of Mr. Whitmore's wounds revealed that Mr. Whitmore suffered a gunshot wound to the chest, two gunshot wounds to the back, and a gunshot wound to the right foot. Investigator Williams testified that, although he had not received the medical examiner's official report, the medical examiner confirmed that each victim had four gunshot wounds. Because Investigator Williams only found three shell casings at the scene, he opined that two weapons were used in the shooting, a revolver and a 10-millimeter semiautomatic firearm. On cross-examination, Investigator Williams testified that he executed a search warrant on the defendant's premises and recovered clothing that was sent for gunshot

residue testing.  He conceded that to the naked eye there did not appear to be any blood on the clothing but stated that he had worked several homicides where there was little or no blood spatter.

The juvenile court found there were reasonable grounds to believe the defendant committed two counts of first-degree murder.  *See* Tenn. Code Ann. § 37-1-134(a)(4).  The juvenile court also found the defendant could not be involuntarily committed for mental illness.  In addressing whether the interests of the community required the defendant to be put under legal restraint or discipline, the juvenile court found that the defendant had no prior record of juvenile offenses.  *See Id*. § 37-1-134(b)(1).  The juvenile court also found that the second factor, the nature of past treatment efforts and the juvenile's response thereto, was inapplicable to the defendant and that this was a violent offense committed against two victims, which is given greater weight than crimes against property.  *Id.* § 37-1-134(b)(2)-(3).  Additionally, the juvenile court found the crimes were committed in an aggressive and premeditated manner.  As the juvenile court noted, "[t]he very definition of first[-]degree murder is a killing that is done in a premeditated manner.  And certainly, murder is an aggressive crime."  *Id.* § 37-1-134(b)(4).  In addressing the possible rehabilitation of the defendant through services currently available, the juvenile court concluded that the procedures, services, and facilities available in the juvenile system could not adequately address rehabilitation "based on the nature of the charges that [the defendant was] facing and [his] age."  *Id.* § 37-1-134(b)(5).  Although there was some testimony regarding gangs, the juvenile court did not find sufficient evidence to consider the conduct gang-related.  *Id.* § 37-1-134(b)(6).

The juvenile court concluded that based on the totality of all of the factors, and particularly the third, fourth, and fifth factors, that there were reasonable grounds to transfer the defendant to circuit court to be tried for two counts of first-degree murder.

## III.    *Motion to Suppress*

Following the defendant's transfer to circuit court, he filed a motion to suppress his statement to investigators.  In his motion to suppress, the defendant argued that he was unlawfully coerced into making an involuntary statement to investigators and that he was not permitted to have his mother present during the interrogation.  The defendant argued that he was subjected to "psychological coercion including, but not limited to, threats that he would face the death penalty if he did not cooperate and that he would be forced to take lie detector and gunshot residue tests."  Body camera footage from officers' initial conversation with the defendant at his house as well as the video of the defendant's interview were entered into evidence, and following argument, the trial court denied the defendant's motion to suppress his statement, finding

that the [d]efendant was seventeen (17) years old at the time of the interview and the [c]ourt was impressed from a viewing of the interview with the intelligence of the [d]efendant and it was clear the [d]efendant understood *Miranda* warnings and the consequences of waiving the rights set forth in the warnings; and, no proof was presented regarding the extent of the [d]efendant's education and there was not indication of intoxication or drug influence or retardation; and, the [d]efendant's parents were not present in the room during the interview but their absence does not render the confession involuntary; and, the interrogation was only one (1) hour in duration such that the [d]efendant did not appear to be fatigued or beaten down; and, despite the fact that the investigator informed the [d]efendant at the beginning of the interview that he could possibly be facing the death penalty based upon the totality of the circumstances present at the [d]efendant's home and at the police station that the statements of the [d]efendant made to the officer[s] of the Milan Police Department were voluntary confessions and as such are admissible upon a trial of this matter.

The defendant then proceeded to trial.

## IV.    Trial

After hearing the proof at trial, which was generally consistent with the testimony at the transfer hearing, the jury found the defendant guilty of two counts of the lesser-included offense of second-degree murder, and the trial court subsequently imposed an effective sentence of twenty years in confinement. The defendant filed a motion for new trial which the trial court denied. This timely appeal followed.

### *Analysis*

On appeal, the defendant contends the juvenile court erred in transferring him to circuit court. The defendant also argues the trial court erred in denying his motion to suppress. The State contends that the juvenile court properly transferred the defendant's case to circuit court and that the trial court properly denied the defendant's motion to suppress.

## I.    Juvenile Transfer

The defendant argues the juvenile court erred in transferring his case to circuit court. Specifically, he contends the juvenile court lacked sufficient evidence to find "probable cause to bind the case over, considering the juvenile court suppressed the [d]efendant's

statement." The State submits the juvenile court properly transferred the defendant's case to circuit court.

The statute governing juvenile transfers provides that after a delinquency petition has been filed, the juvenile court "may transfer the child to the sheriff of the county to be held according to law and to be dealt with as an adult in the criminal court of competent jurisdiction." Tenn. Code Ann. § 37-1-134(a). The statute further requires that "[t]he disposition of the child shall be as if the child were an adult if:" (1) as applied to this case, the child was at least sixteen at the time of the offense, (2) a hearing was held in conformity with the statute, (3) the notice requirements were met, and (4) the court finds probable cause to believe that:

(A) The child committed the delinquent act as alleged;
(B) The child is not committable to an institution for the developmentally disabled or mentally ill; and
(C) The interests of the community require that the child be put under legal restraint or discipline.

Tenn. Code Ann. § 37-1-134(a)(1)-(4). Accordingly, a transfer from juvenile court is discretionary unless the grounds in subsection (a) are established. *Howell v. State*, 185 S.W.3d 319, 329 (Tenn. 2006). The statute also requires the juvenile court to consider certain factors in determining whether transfer is appropriate:

(b) In making the determination required by subsection (a), the court shall consider, among other matters:

(1) The extent and nature of the child's prior delinquency records;

(2) The nature of past treatment efforts and the nature of the child's response thereto;

(3) Whether the offense was against person or property, with greater weight in favor of transfer given to offenses against the person;

(4) Whether the offense was in an aggressive and premeditated manner;

(5) The possible rehabilitation of the child by use of procedures, services and facilities currently available to the court in this state; and

- 8 -

(6) Whether the child's conduct would be a criminal gang offense, as defined in § 40-35-121, if committed by an adult.[7]

Tenn. Code Ann. § 37-1-134(b).

This Court has previously stated that in reviewing a transfer decision, we do not evaluate the preponderance of the evidence but review to determine whether there are reasonable grounds or probable cause to support the decision to transfer. *See State v. Strickland*, 532 S.W.2d 912, 920 (Tenn. 1975); *State v. Reed*, No. M2009-00887-CCA-R3-CD, 2010 WL 3432663, at *6, *10 (Tenn. Crim. App. Aug. 31, 2010) (noting the terms "probable cause" and "reasonable grounds" are used "interchangeably" in juvenile transfer analysis), *perm. app. denied* (Tenn. Jan. 13, 2011). This Court reviews a juvenile court's findings for an abuse of discretion. *State v. Polochak*, No. M2013-02712-CCA-R3-CD, 2015 WL 226566, at *38 (Tenn. Crim. App. Jan. 16, 2015) ("A juvenile court's findings in determining whether reasonable grounds exist to establish the criteria in subsection (a)(4) are reviewed for an abuse of discretion."), *perm. app. denied* (Tenn. May 14, 2015). The juvenile court is afforded "a wide range of discretion" in determining whether to transfer a child from juvenile to criminal court. *Strickland*, 532 S.W.2d at 921. However, a transfer from juvenile court is mandatory once the grounds in subsection (a) are established. *Howell*, 185 S.W.3d at 329.

Here, the juvenile court thoroughly made the statutorily required findings. Having found that the defendant was seventeen years old and had notice of the hearing, the juvenile court found there were reasonable grounds to believe that the defendant had committed two counts of first-degree murder and that he was not committable to an institution due to developmental disability or mental illness. In evaluating whether the interests of the community required the defendant to be put under legal restraint, the juvenile court found that the defendant had no prior criminal history or past treatment efforts. Additionally, although there was some testimony regarding gangs, the juvenile court did not find it to be enough to consider the conduct gang-related. The juvenile court noted that these were violent offenses against two victims, which the legislature prioritized over crimes against property. The juvenile court further found that the crimes were committed in an aggressive and premeditated manner, noting that "[t]he very definition of first[-]degree murder is a killing that is done in a premeditated manner. And certainly, murder is an aggressive crime." Finally, the juvenile court expressed doubt that the defendant could be successfully rehabilitated through the juvenile system "based on the nature of the charges that [the defendant was] facing and [his] age."

---

[7] In 2023, our legislature added an additional factor for juvenile courts to consider in determining whether transfer is appropriate: Whether the child has a history of trauma or abuse, including, but not limited to, the child's being a victim of a human trafficking offense as defined in section 39-13-314. *See* Tenn. Code Ann. § 37-1-134(b)(7).

In his brief to this Court, the defendant acknowledges that the juvenile court "found that all three prongs of Tennessee Code Annotated section 37-1-134(a)(4) were present." However, the defendant disagrees with the juvenile court's findings. Specifically, he contends the juvenile court's findings of fact do not indicate that the defendant was present during the shootings, that he possessed a gun, or that he threatened anyone. Therefore, he argues the juvenile court erred in finding there were reasonable grounds to believe the defendant committed the offense. We note that in a transfer hearing, "[t]he trial judge's finding of fact are given the weight of a jury verdict and are conclusive unless we find that the evidence preponderates against these findings." *State v. Swatzell*, No. 01-C01-9005-CC-00126, 1992 WL 25008, at *1 (Tenn. Crim. App. Feb. 14, 1992). The juvenile court was presented with evidence that the defendant and Mr. Walton were at The Meadows apartment complex prior to the shooting where they interacted with one of the victims, and multiple witnesses testified that Mr. Walton had a gun in his waistband. Mr. Williams testified that he saw two people speed walking near his godbrother's house following the shooting. He later identified the two people as the defendant and Mr. Walton in a photo array; however, at the transfer hearing he testified that they only looked like the two people he saw that night. Investigator Williams testified that each victim suffered four gunshot wounds. However, because he only recovered three shell casings from the crime scene, he concluded that both a revolver and a 10-millimeter semiautomatic weapon were used during the shootings. Based on this testimony, we cannot conclude that the juvenile court's findings were in error. Accordingly, we conclude the juvenile court considered the statutory factors and made appropriate findings, which are supported by the record, in determining whether transfer was appropriate. The defendant is not entitled to relief on this issue.

## II. *Motion to Suppress*

The defendant argues the trial court erred in failing to grant his motion to suppress. Specifically, the defendant contends his statement should have been suppressed because his mother was not allowed in the interrogation room and because he was subjected to psychological coercion, including threats that he faced the death penalty. The State contends the trial court properly denied the defendant's motion to suppress.

Suppression issues on appeal are subject to well-established standards of review. Appellate courts are bound by a trial court's findings of facts determined after a suppression hearing unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. McGee*, No. E2011-01756-CCA-R3-CD, 2012 WL 4017776, at *2 (Tenn. Crim. App. Sept. 13, 2012). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23.

Appellate courts should consider the entire record, affording the prevailing party "the strongest legitimate view of the evidence and all reasonable inferences drawn from that evidence." *McGee*, 2012 WL 4017776, at *2 (citing *State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001)); *see also State v. Sanders*, 452 S.W.3d 300, 306 (Tenn. 2014). However, applying the law to the factual findings of the trial court is a question of law, which is reviewed *de novo* on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997).

*A.     Miranda*

The defendant argues that he "lacked the experience and intelligence to fully understand the implications of waiving his *Miranda* right to make a statement." He also argues that he requested the presence of his mother during his interrogation but was denied.

Initially, we note that the defendant was not under arrest when he spoke with officers and ultimately confessed. Per the body camera footage, the defendant and his mother were told no less than three times that he was not under arrest and that the officers just wanted him to come to the station and talk to them. The defendant then agreed to go and speak with the officers. Additionally, while the defendant rode with officers to the station, he was not placed in handcuffs. The *Miranda*[8] decision only applies "to the questioning of an individual who has been taken into custody or otherwise deprived of his freedom by the authorities in a significant way." *State v. Dailey*, 273 S.W.3d 94, 102 (Tenn. 2009) (quoting *Miranda*, 384 U.S. at 478) (internal quotation marks omitted). Accordingly, *Miranda* warnings are only required when a suspect is (1) in custody and (2) subjected to questioning or its functional equivalent. *State v. Walton*, 41 S.W.3d 75, 83 (Tenn. 2001). In the absence of either, *Miranda* requirements are not necessitated. *Id.* Accordingly, because the defendant was not under arrest or in custody at the time he spoke with officers and ultimately confessed, officers were not required to *Mirandize* him. However, despite this, the defendant was advised of his rights on three occasions and waived them prior to confessing – once at home and twice at the police station.

Despite, as noted above, that a *Miranda* waiver is not required, we will address the defendant's claim – whether his waiver was knowing and voluntary. The Fifth Amendment to the United States Constitution, applicable to states through the Fourteenth Amendment, states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. Similarly, the Tennessee Constitution states "that in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. If a suspect is in police custody "or otherwise [has been] deprived of his freedom of action in any significant way," the police must first inform him

---

[8] *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

of his Fifth Amendment rights for any subsequent confession to later be admissible as substantive evidence. *Miranda*, 384 U.S. at 444. In this regard, the United States Supreme Court has said, "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* These rights must be voluntarily, knowingly, and intelligently waived. *Id.*

In *State v. Callahan*, our supreme court held that "juvenile waivers shall be analyzed under a totality-of-the-circumstances test" and that courts should consider the following factors:

(1) . . . all circumstances surrounding the interrogation including the juvenile's age, experience, education, and intelligence;

(2) the juvenile's capacity to understand the *Miranda* warnings and consequences of the waiver;

(3) the juvenile's familiarity with *Miranda* warnings or the ability to read and write in the language used to give the warnings;

(4) any intoxication;

(5) any mental disease, disorder, or retardation; and

(6) the presence of a parent, guardian, or interested adult.

979 S.W.2d 577, 583 (Tenn. 1998). While this Court should "exercise special care" in analyzing a juvenile's waiver, "no single factor such as mental condition or education should by itself render a confession unconstitutional absent coercive police activity." *Id.*

Applying the *Callahan* factors, we conclude the trial court did not err in finding the defendant's waiver was valid. At the time of the defendant's interview, he was seventeen years old and in the twelfth grade; however, no proof was presented regarding the defendant's grades or school records. Although the defendant did not have prior experience with the criminal justice system, the trial court "was impressed from a viewing of the interview with the intelligence of the [d]efendant and it was clear the [d]efendant understood the *Miranda* warnings and the consequences of waiving the rights set forth in the warnings." The defendant does not contend that he was intoxicated during the interview, and the trial court found "no indication of intoxication or drug influence." The trial court likewise found that the defendant was not suffering from any mental disease or defect. While this Court is troubled by the fact that the defendant did not have the advice

of a parent, guardian, or interested adult, "the admissibility of a juvenile's confession is not dependent upon the presence of his parents at the interrogation." *State v. Carroll*, 36 S.W.3d 854, 864 (Tenn. Crim. App. 1999). Accordingly, we conclude that under the totality of the circumstances the defendant's waiver was voluntary, knowing, and intelligent.

B.      *Voluntariness/Coercion*

The defendant also argues that he was "subject to psychological coercion including, but not limited to, threats that he would face the death penalty if he did not cooperate and that he would be forced to take lie detector and gunshot residue tests." The State submits the defendant waived the issue of voluntariness for failing to reference it at the suppression hearing. However, the trial court thoroughly discussed Investigator Williams' statement regarding the death penalty throughout the suppression hearing and found in both its oral and written findings that the defendant's statement was voluntary. Therefore, we will review the defendant's claim on the merits.

The voluntariness of a confession "remains distinct from *Miranda*." *State v. Climer*, 400 S.W.3d 537, 567 (Tenn. 2013) (citing *Dickerson v. United States*, 530 U.S. 428, 432-33 (2000). In determining the voluntariness of a confession, the essential inquiry is whether a suspect's will was overborne so as to render the confession a product of coercion. *Id.*; *see State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996) ("The test of voluntariness for confessions under article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment.").

In order to determine the voluntariness of the defendant's statement, we must consider the totality of the circumstances surrounding the statement, including "both the characteristics of the accused and the details of the interrogation." *Climer*, 400 S.W.3d at 568 (quoting *Dickerson*, 530 U.S. at 434). The circumstances relevant to this determination are:

> [T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured[,] intoxicated[,] or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep[,] or medical

attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

*Id.* (alterations in original) (quoting *State v. Huddleston*, 924 S.W.2d 666, 671 (Tenn. 1996)).

Our review of the record affirms the trial court's finding that the defendant's statement was voluntary and uncoerced. As discussed *supra*, the defendant was seventeen years old and in the twelfth grade at the time of his statement. He had no experience with law enforcement, and no evidence existed that he had a mental disability or illness. During the defendant's interview, he appeared calm, was not overly emotional, and did not appear to be under the influence of intoxicants. Moreover, the defendant was read his *Miranda* rights three times, once at his house with his mother present and twice at the station at the beginning of the interview, and at no time did the defendant indicate he wished to exercise his rights and terminate the interrogation or speak with a lawyer. Additionally, no proof was offered showing that the defendant's mother requested termination of the interview. The defendant was provided food and water, he was not restrained at any time, and he was not physically abused or threatened with abuse if he did not provide a statement. While the defendant was interviewed off and on for six hours, he provided a significant portion of the statement in question and implicated himself in the murder after only one hour. Within the first hour, the defendant admitted to the following: that he had a "beef" with the victim and that they had been arguing over social media; that the defendant even threatened the victim stating, "you'll see me when you see me" and "come to my back yard and we gonna squash, we gonna fight, we gonna squash it"; he also admitted that he interacted with the victim the evening prior to the shooting and that during their interaction the victim and the victim's friends were armed; and finally, while initially denying he had a gun, the defendant admitted that during a second interaction with the victim that evening, he was standing with his co-defendant when the co-defendant shot the victim.

Although the defendant contends he was psychologically coerced into giving his statement with threats of polygraph and gunshot residue tests, there is no evidence in the record to suggest that either the polygraph or gunshot residue tests were a ruse to coerce the defendant into giving a statement. After the defendant denied being at the scene during the shootings, Investigator Williams asked him if he had ever taken a polygraph test before. The defendant stated that he had not but that he would be willing to take one. Investigator Williams suggested that the defendant would fail a polygraph test because police had received multiple calls from people who identified the defendant as being at the scene when the shootings occurred. Later, Investigator Williams asked the defendant if his hands would test positive for gunshot residue, and the defendant denied that they would test positive. Although the defendant's hands were not tested that night, at trial, Investigator Williams testified that clothing collected from the defendant's house tested positive for

gunshot residue.  Finally, although Investigator Williams incorrectly stated the law in regard to minors being eligible for the death penalty, a fact which was later corrected in front of the defendant by the chief of police, the proof, taken together, confirms that the defendant's statement was not "extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence," or law enforcement overreach. *Bram v. United States*, 168 U.S. 542, 542-43 (1987).  Accordingly, while we are, as noted *supra*, are troubled by the fact that the defendant was not allowed to see his mother, under the totality of the circumstances, it is clear the defendant's statement to law enforcement was voluntary and was not a product of coercion. *See Climer*, 400 S.W.3d at 568. The defendant is, therefore, not entitled to relief.

### *Conclusion*

Based on the foregoing authorities and reasoning, the judgments of the trial court are affirmed.


_____
J. ROSS DYER, JUDGE

- 15 -